IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

NOV 1 9 2013

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

TAMMY J. FOLEY,

     Plaintiff,

*vs.*                                   Civil Action No. 5:12cv179
                                        (The Honorable Frederick P. Stamp, Jr.)

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

## REPORT AND RECOMMENDATION/OPINION

Tammy J. Foley ("Plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Plaintiff filed an application for SSI on June 14, 2010, and an application for DIB on May 17, 2010, alleging disability since May 7, 2010, due to bipolar disorder, panic disorder, depression, paranoia, vertigo, and disc disease (R. 137, 139, 166). The state agency denied Plaintiff's applications initially and on reconsideration (R. 57-60). Plaintiff requested a hearing, which Administrative Law Judge Jeffrey P. LaVicka ("ALJ") held on December 20, 2011, and at which Plaintiff, represented by counsel, Travis Miller, and Larry Kontosh, a vocational expert ("VE")

testified (R. 27). On January 13, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 12-22). Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council (R. 7). On October 18, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on May 15, 1961, and was forty-eight (48) years old as of her alleged onset date of May 7, 2010 (R. 137). Plaintiff has a high school education and attended college (R. 33). Plaintiff's past relevant work included financial aid officer, financial aid and student account manager, and activity director at a nursing home (R. 182).

Plaintiff presented to Dr. Woofter on June 5, 2009, as a new patient. She had "sharp" low back pain that radiated to both legs. She had lumbar spine tenderness but no numbness or tingling in her legs. Her gait was normal; she had good eye contact; she was neurologically intact; her speech was clear. Dr. Woofter ordered an x-ray of Plaintiff's lumbar spine and chest x-ray. He refilled Lexapro and Xanax for Plaintiff's anxiety and depression (R. 282).

Plaintiff's June 16, 2009, chest and lumbar spine x-rays were normal (R. 263-65, 280).

Plaintiff presented to Dr. Woofter on June 19, 2009, with complaints of chronic back pain. Plaintiff stated the pain radiated to both legs and had gotten "worse within last 6 months." Dr. Woofter noted Plaintiff's lumbar spine x-ray was negative. Plaintiff had difficulty falling asleep. She had numbness in her legs. Her breath sounds were diminished. She had normal resting muscle tone. She was neurologically intact. Her speech was clear. She was diagnosed with thrombocytosis due to elevated blood platelets; hyperlipidemia, for which she was instructed to reduce her intake of fatty foods; chronic back pain, for which an MRI was ordered; COPD, for which she was prescribed Spiriva; and insomnia, for which she was prescribed Ambien (R. 279).

2

Plaintiff presented to the emergency department at Fairmont General Hospital on July 7, 2009, with complaints of lumbar pain (R. 261).

Plaintiff's July 10, 2009, lumbar spine MRI showed degenerative L4-L5 disc change without definite nerve root impingement (R. 262, 278).

On July 27, 2009, Dr. Woofter noted Plaintiff's MRI showed disc herniation at L4-L5. Plaintiff reported pain across her lower back. She described her pain as "ache with occasional sharp pain to both legs." Upon examination, Dr. Woofter found Plaintiff had tenderness over her lower lumbar paravertebral muscles. Plaintiff was neurologically intact; her speech was clear; her gait was normal. Dr. Woofter diagnosed lumbar degenerative disc herniation, prescribed Lortab, told Plaintiff to continue medicating with naproxen, and referred Plaintiff to "neurosurgery" (R. 277). Plaintiff was treated by Dr. Woofter on September 25, 2009, for vomiting. Dr. Woofter found Plaintiff was neurologically intact and had normal gait. He prescribed phenergan (R. 275).

On December 8, 2009, Plaintiff informed Dr. Woofter she was "doing well on Lexapro and Xanax." There were "days [that] she [had] increased anxiety and need[ed] Xanax." Her straight-leg raising test was negative; she had good eye contact and was neurologically intact; her affect was "upset about losing her niece." She had cancelled her "neurosurg. referral." Dr. Woofter diagnosed anxiety and depression and prescribed Lexapro and Xanax; chronic lumbar back pain due to degenerative disc disease and prescribed Lortab; and COPD and hyperlipidemia (R. 274).

Plaintiff presented to the emergency department at Grafton City Hospital on February 5, 2010, with chest pain (R. 233). Her chest x-ray was normal (R. 245). She was diagnosed with a peptic ulcer and costochondritis (R. 247-48).

Plaintiff presented to Dr. Woofter on February 12, 2010, for a follow-up examination for her chest pain and shortness of breath. Plaintiff informed Dr. Woofter that she had gone "to Grafton ER

and . . . was told she had an anxiety attack." Plaintiff reported her last panic attack was one (1) month earlier and Xanax "help[ed] prevent them." Plaintiff was neurologically intact. She had a normal gait. Her eye contact was "good." Plaintiff refused hospitalization for a stress test. Dr. Woofter noted Plaintiff's chest pain was "most likely due to anxiety." Dr. Woofter diagnosed anxiety and depression. He continued Plaintiff's prescriptions for Lexapro and Xanax and referred her to Dr. Salman (R. 273).

Plaintiff's March 30, 2010, chest x-ray was normal, and her echocardiogram ("EKG") was normal, except for "mild triscupid regurgitation with pulmonary artery" (R. 270, 272).

Plaintiff reported to Dr. Salman, on April 2, 2010, that she had had depression and anxiety for twenty (20) years. Plaintiff stated she had had "episodes of depression - niece killed in car." Plaintiff stated her appetite was poor; and her sleep was "awful." Plaintiff stated she medicated with Xanax and Ambien. Dr. Salman found Plaintiff's mood was depressed and her affect was labile. Dr. Salman diagnosed bipolar disorder and prescribed Lexapro and Lamictal (R. 290, 365).

Plaintiff reported to Dr. Woofter on April 16, 2010, that her chest pain had resolved. She stated she was "put on Lamictal" by Mr. Garcia, who worked with Dr. Salman. She stated that when she was manic, she would spend money and did not sleep. She said Lamictal decreased her racing thoughts. Plaintiff was neurologically intact. Her affect was "more calm." Dr. Woofter increased Plaintiff's dosage of Lamictal and instructed her to continue medicating with Lexapro (R. 268).

Plaintiff presented to the emergency department at Fairmont General Hospital on May 7, 2010, with complaints of panic attack (R. 249). Plaintiff reported she had been experiencing "'bad depression' with anxiety attacks" for one (1) week. She was crying and anxious. She had no pain. She was alert and oriented as to person, place, and time. Her speech was normal; her respiratory effort was even and unlabored. Plaintiff stated she had pain in her chest (R. 251). Plaintiff stated

she had been previously diagnosed with anxiety, bipolar disorder, and depression. She lived alone. She smoked one (1) package of cigarettes per day (R. 252). She was medicated with Ativan (R. 252). Upon release from the emergency department, Dr. Richardson listed "anxiety reaction" as diagnosis (R. 250). She was in "good [c]ondition: stable [c]ondition; improved" (R. 252).

May 7, 2010, is Plaintiff's alleged onset date (R. 162).

Dr. Woofter treated Plaintiff on May 11, 2010, for bipolar disorder. Plaintiff reported she had been "more anxious." Plaintiff stated she tolerated Lamictal "well." She was "not . . . tired." Plaintiff informed Dr. Woofter she "[felt] like she need[ed] time off [from work because of] recurrent panick (sic) attacks." Dr. Woofter found Plaintiff's speech, eye-contact, insight, and judgment were "good." Dr. Woofter noted Plaintiff had been referred to Dr. Salman for bipolar disorder and she would reschedule an appointment with him. He increased Plaintiff's dosage of Lamictal. He refilled Plaintiff's prescription for Xanax (R. 266).

Lab tests on May 14, 2010, indicated Plaintiff was positive for Oxazopam, an unprescribed benzodiazepine, in addition to her prescribed benzodiazepines. A handwritten note states she was not prescribed this medication. The lab report notes: "The presence of Oxazopam has been confirmed. This is evidence of taking an unprescribed Benzodiazepine medication" over the last two to four days (R. 283).

Plaintiff filed her application for Disability Benefits on May 17, 2010, with an alleged onset date of May 7, 2010 (R. 137). During her in-person application, the Agency employee noted she was a "nice lady/cried a couple times as we talked," but noted no other difficulties, physical or mental. There were no difficulties noted in understanding, coherency or concentrating.

On May 17, 2010, Plaintiff reported to the therapist at Dr. Salman's office that she had increased anxiety and was not sleeping. Plaintiff had to "take more Xanax" and that was affecting

her work. She had a rapid heartbeat, felt hopeless and helpless, had poor concentration and focus, and had anhedonia. She had "ups & downs" and was "sometimes afraid to leave home." Plaintiff stated she could not "get over niece's death." She was afraid to drive and it was "hard to deal" with work. Plaintiff reported she thought "about moving from her" apartment "to either be" with "her children[] or her family home." Dr. Salman continued Plaintiff's prescription of Seroquel, and instructed Plaintiff to "taper off" and then discontinue medicating with Lexapro (R. 289, 364).

Plaintiff presented to the therapist at Dr. Salman's office on May 21, 2010, with complaints of depression, mood swings, agitation, irritability, being anxious, and racing thoughts. Plaintiff had difficulty sleeping and was "up & eat during night." She could "fall[] back asleep faster but still [woke] up every couple hours." She had poor concentration; she was moody; she had a "jumpy" feeling in her chest; she had a "'high feeling' [the] other day but didn't last." She "struggled to get dressed," put on make up, and style her hair. Plaintiff reported she was "taking on too many projects." She was "trying to spring clean, paint." She was "staying with her parents lately." She had no psychotic symptoms. Dr. Salman increased Plaintiff's dosage of Lamictal (R. 288, 363).

On June 1, 2010, Plaintiff told the therapist at Dr. Salman's office that she was "better." She stated she was anxious and depressed. She broke into tears at times and would be asked "if she's ok." She reported crying spells, and said she could not "go in public." She was not enjoying her "normal hobbies." She had no psychomotor retardation. She was diagnosed with depression and anxiety. Dr. Salman increased Plaintiff's dosage of Lamictal (R. 291, 362).

On June 11, 2010, Plaintiff reported to the therapist at Dr. Salman's office that she had "good days & bad," had crying "spells," and was depressed and anxious. She slept for four (4) or five (5) hours per night. Seroquel helped her sleep. She had to "force self to complete tasks." Plaintiff stated she had difficulty driving because it made her "very anxious." She had "been like this since

6

niece died in car accident last" year. She did not have psychomotor retardation, suicidal or homicidal thoughts or plans, or psychotic symptoms. Her prescriptions were renewed (R. 287, 361).

On June 28, 2010, Plaintiff reported to the therapist at Dr. Salman's office that she was "up & down"; she had "good days & bad days"; her focus, concentration, and memory were poor; and she had decreased energy and anhedonia. She did not want "to be in public." She "[felt] like she [was] not in room – just watching it all happen." Plaintiff wanted "to discuss medical leave" with Dr. Salman. He "cut Seroquel" and increased her dosages of Topamax and Lamictal (R. 286, 360).

Plaintiff completed a "Function Report" for the Agency on July 2, 2010 (R. 174). Where asked how her illnesses or conditions affected her ability to work, she stated she had no problem with personal care and needed no reminders to take care of her personal care and grooming. She performed household chores and laundry "only when forced due to necessity," needing "[e]ncouragement and reminder of the need to perform simple tasks from therapist and family." She did not shop. She could pay bills and handle a checking and savings account. She visited only with her family and only "weekly when forced."

Under the section of the Function Report headed "Information about Abilities," Plaintiff checked off that her illnesses, injuries or conditions affected memory, completing tasks, concentration, bending, standing, walking, and sitting (R. 179). Where asked to explain, she wrote: Bipolar disorder and panic disorder affect memory tasks and concentration - - Degenerative disc disease and vertigo affect bending, standing, walking, sitting and general movement." She noted she could walk "50 yards" before needing to stop and rest "5 minutes."

On her Personal Pain Questionnaire, Plaintiff stated she had pain in her lower back that was an aching, burning, "shooting pain," that was "continuous[] during flare-up" (R. 190). Nothing made

7

it better, and "everything" made it worse. She could not "stand, sit, stretch without this constant shooting pain." She had been taking Loracet the summer before, but stopped because it was addictive. She was at the time of the application taking Naproxen every four hours which "sometimes" relieved the pain.

In conjunction with Plaintiff's filing her applications for SSI and DIB, she completed a Function Report - Adult on July 2, 2010. Plaintiff wrote that she was unable to work "due to increascd (sic) and severity of panic attacks and bipolar disorder." She wrote that the "episodes force" her "to leave work without warning." She was paranoid and fearful at work, in "social settings, and in public places. She did not want to leave home. Plaintiff noted she had this "condition" for twenty-three (23) years, but it had "escalated" in the past five (5) years (R. 174). Plaintiff listed the following activities of daily living: woke, drank coffee, "[tried] to straighten up the house when [she could] stay focused," remembered to eat late in the afternoon, watched television, and went to bed. Plaintiff wrote she had insomnia, "even with medication," and was "up & down all night" (R. 175). She had no problem with her personal care and needed no reminders to care for her personal needs and grooming or to take her medications (R. 175-76). Plaintiff reported she prepared "very simple" meals "once a day." She ate "toast, cereal or sandwiches once or twice a day." She did not cook because she did not have the "energy or appetite." Plaintiff could complete household chores and laundry "only when forced due to necessity." It took her "two days to accomplish simple tasks" because she lacked energy, had impaired concentration, and had no interest in completing the task. Plaintiff needed reminders and encouragement from her family, therapist, and doctors to perform simple tasks (R. 176). She went outside twice weekly to attend medical appointments, rode in a car, and did not feel safe. She was fearful that "something bad" would happen to her if she drove a car. Plaintiff wrote that she attempted not to shop due to anxiety

and not wanting to be "around people"; she sent someone to buy what she needed. Plaintiff could pay bills, count change, handle savings accounts, and use a check book (R. 177).

Plaintiff listed reading, "spending time with family," and watching television as her interests; however, these activities were decreased due to "lack of interest and concentration." Plaintiff listed "visiting family" as a social activity; however, she wrote that she does that "weekly when forced." Plaintiff did not "go anywhere on a regular basis anymore" (R. 178). She did not "take part in social activities or outings." Plaintiff wrote that "Bipolar [d]isorder and panic disorder affect[ed] memory, tasks and concentration – Degenerative disc disease and vertigo affect[ed] bending, standing, walking, sitting and general movement." She could walk only fifty (50) yards before needing to stop and rest for five (5) minutes. Plaintiff could pay attention for five (5) minutes "at the most." She did not finish what she started. She did not follow written or spoken instructions "well at all due to lack of concentration" (R. 179). Plaintiff wrote that she got along "ok" with authority figures and that she was "pretty timid lately." Plaintiff wrote that she had been laid off from jobs "due to attendance related to illness." Plaintiff did not "handle stress at all." She had "to remove [herself] from situation or [she would] break down." Plaintiff did not handle changes in routine well because she felt she had to "stay in [her] 'safe zone.'" Plaintiff reported she feared answering the phone or door because she felt "like something bad [was] going to happen" (R. 180).

J. Bland, Dr. Salman's physician assistant ("P.A."), evaluated Plaintiff on July 12, 2010, for depression, anxiety, and agitation, which occurred "at times." Plaintiff reported increased panic attacks, fear of driving, anxiety when in crowds, racing thoughts, feeling hopeless and helpless, decreased energy, anhedonia, and crying "spells." She had been writing in a journal. P.A. Bland found Plaintiff had no suicidal or homicidal thoughts, psychomotor retardation, or psychotic symptoms and renewed Plaintiff's prescriptions and increased her dosage of Topamax (R. 359).

9

Plaintiff presented to Amy Woodruff, M.S.W., a member of Dr. Salman's staff, on July 20, 2010, with complaints of depression, agitation, and anxiety. Plaintiff stated she slept for six (6) hours per night but "fear[ed] she [would not] be able to sleep"; had crying "spells"; and no improvement in her mood. Ms. Woodruff found Plaintiff had no psychomotor retardation, homicidal or suicidal thoughts, or psychotic symptoms. Ms. Woodruff "[p]rocessed [Plaintiff's] emotions after having a benefit for her deceased niece" and "discussed & role modeled ways to use self-talk to cope [with] anxiety." Plaintiff was tearful during the counseling session. P.A. Bland increased Plaintiff's dosage of Lamictal and renewed prescriptions for her other medications (R. 358).

On August 2, 2010, Plaintiff reported to Ms. Woodruff that she experienced depression and continued being anxious. Plaintiff stated there had been no improvement of her symptoms with the increased dosage of Lamictal because she had increased crying "spells." She slept six (6) hours per night when medicating with Ambien. She reported headaches, feeling hopeless and helpless, decreased energy, and anhedonia. Plaintiff had no psychomotor retardation or suicidal or homicidal thoughts. Ms. Woodruff noted Plaintiff was "tearful during exam." Plaintiff stated she was "out" of Ambien, which was prescribed by Dr. Woofter. Ms. Woodruff noted Plaintiff had no psychotic symptoms. Ms. Woodruff discussed the following with Plaintiff: her family's history of mental illness; Plaintiff's fear that one of her children was "having issues"; and her crying "spells" and depression. Ms. Woodruff noted Plaintiff was "unable to" identify "what goes through her mind at these times." Ms. Woodruff encouraged Plaintiff to "begin journalling (sic) her thoughts during these moments" and to "review" them "in therapy" (R. 357).

On August 11, 2010, Dr. Biundo completed a consultative physical examination of Plaintiff at the request of the State agency. Plaintiff reported her chief complaint as "difficulties in terms of being able to function due to mental illness as well as low back pain." Plaintiff stated she had

"struggle[d] . . . with bipolar disorder for a number of years." She had difficulty staying "calm and collective." [sic] She became anxious and depressed. Plaintiff stated she had "been followed by psychiatry regularly and [was] on multiple meds[;] however[, she] still ha[d] not been able to function very well because of the bipolar disorder." Plaintiff reported she was "functionally independent in all areas" except she was "not able to drive secondary to '"fear.'" Plaintiff reported pain "across the lumbosacral spine going across the hips and . . . to bilateral buttock." She reported no weakness or paresthesias in the lower or upper extremities. Dr. Biundo noted Plaintiff's July 10, 2009, lumbosacral spine MRI showed L4-L5 degenerative joint disease. Plaintiff reported chronic vertigo without nausea and vomiting. Her chest x-rays and head CT scan were unremarkable. She had no headaches, double vision, or ringing in ears. She stated she could not work "primarily because of mental illness." Plaintiff reported she medicated with Lamictal, Seroquel, Topamax, Ativan, Ambien, and Naproxen. She continued to smoke (R. 292).

Upon physical examination, Dr. Biundo found Plaintiff's vital signs were normal, cervical spine was "excellent," and cranial nerves were normal. Plaintiff's range of motion of her lumbar spine was normal with "discomfort noted" on extension, lateral flexion, and rotation. Plaintiff's lateral flexion and straight leg raising tests were normal (R. 293). Dr. Biundo's examinations of Plaintiff's shoulders, elbows, wrists, hips, ankles, cervical spine, and lumbar spine were all normal (R. 294-95). He did note tenderness across her T-12, L-1, L4, L5, and S1 "with slight increase in tone in the lumbosacral paraspinals with slight increase in lumbar lordosis noted on postural assessment." Plaintiff's strength, reflexes, and sensation were normal. She had no tremors, spasticity or abnormal movement. Dr. Biundo recommended a psychiatry evaluation and found Plaintiff 's "features of lumbosacral spine appear[ed] to be most consistent with degenerative changes . . ." He recommended physical therapy (R. 293).

Martin Levin, M.A., a psychologist, completed a Mental Status Examination of Plaintiff on August 12, 2010. He noted Plaintiff was appropriately dressed and groomed, except that her hair was "mussy." She had a valid driver's license, which she obtained by passing a written test, but her father drover her to the examination. Plaintiff was pleasant and cooperative, but her affect was "rather labile throughout the session." Plaintiff's gait and posture were normal. Mr. Levin reviewed the May, 7, 2010, nurse's notes from Fairmont General Hospital (R. 297).

Plaintiff reported to Mr. Levin that her childhood had been happy. She was divorced and had two adult children. She presently lived with her parents in Salem, "although her permanent address was in Grafton"; "things [were] good at home." Her chief complaints were vertigo, disc disease, "panics," and "mood swings that last a month or two at a time." Plaintiff reported the onset of her "problems" was twenty (20) years earlier (R. 297). She stated her mental illness symptoms were manic and depressive episodes that last "approximately two months each"; she was "currently in a depressed episode and [was] sad and irritable most of the time." She reported decreased memory, concentration, energy, and interests; difficulty falling asleep and staying asleep; waking early in the morning; increased appetite and weight; crying spells four (4) times per day; and "full panic attacks," which included hyperventilation, tachycardia, chest pain, and "feeling as if she [was] going to have a heart attack." Plaintiff had no suicidal ideations (R. 298).

Plaintiff told Mr. Levin that she was treated by Dr. Salman every other week and "on the between weeks she [saw] the therapist at Dr. Salman's office." She had been treated by Drs. Guy, McClure and Goodykoontz and had been in therapy with Hillary Gordon and Pat Ryan. She medicated with Wellbutrin, Lamictal, Seroquel, Topamax, Ambien, Ativan, and Zocor. Her sleep pattern did "better with medication." Lamictal caused her to eat more and gain weight (R. 298).

Plaintiff attended regular high school classes, was a cheerleader, graduated from high school

in 1979, and attended college at Salem College and Fairmont State College for one (1) year each. Her past work included waitress, nursing home activity director, and college financial aid director (R. 298).

Mr. Levin found Plaintiff's speech was normal and adequate. She was oriented to person, place, time and circumstance. Her mood was depressed and affect was labile. Her thought process and content were within normal limits, "although [Plaintiff] describe[d] some 'moments of paranoia'" and disassociative episodes "where she [felt] like she [was] watching everything from up above." Her perceptual, psychomotor behavior, judgment, immediate and remote memories, persistence, and pace were normal; recent memory and concentration were moderately deficient; and social functioning was appropriate, pleasant, very anxious, and very depressed (R. 299).

Plaintiff informed Mr. Levin that she desired to stay home and did "not want to be around anybody else"; however, when she was "in manic episodes[,] she [was] just the opposite." Plaintiff listed the following activities of daily living: rose from bed at no regular time "because she did not work"; "spen[t] a lot of time watching" television and "[felt] 'tranced out'"; spent some time with her parents; did some housework; worked in her flower garden; took care of some animals at her parents' farm; read; ate meals with her family; and cared for her own personal hygiene and grooming, but "may go two or three days without doing so and even longer if she's alone." Plaintiff stated she "no longer bother[ed] to do her hair or her makeup" (R. 299).

Mr. Levin diagnosed Plaintiff with bipolar disorder, most recent episode depressed, severe and without psychotic features, and panic disorder without agoraphobia (R. 299). Mr. Levin based his diagnoses on Plaintiff's presenting symptoms. Mr. Levin found Plaintiff's prognosis was poor and that she was competent enough to manage her own money (R. 300).

Physician Assistant Bland evaluated Plaintiff on August 16, 2010. Plaintiff reported her

mood swings were "better; her anxiety was the "same"; her sleep was "good"; and her racing thoughts were "better." Plaintiff reported depression, and her focus and concentration were "still poor." She woke at night, ate sweets, and had reduced energy. She "still [did not] leave home often" and got "panic when anyone ask[ed] her to go somewhere." Plaintiff reported headaches in the afternoon. She had no psychomotor retardation and no suicidal or homicidal thoughts. Plaintiff was tearful during the exam. P.A. Bland increased Plaintiff's dosage of Topamax and Ativan (R. 356).

On August 26, 2010, Dr. Reddy completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff relative to back strain with mild degenerative disc disease and vertigo. Dr. Reddy did not find any limitations. Dr. Reddy noted the following: "49 year old well built female with allegations of back strain due to mild DDD, not well established, (sic) she claim[ed] to have vertigo, again not well established in her medical evidence. She seem[ed] to take meds for her mental issues. Not credible. Non severe physical." Dr. Reddy reviewed Plaintiff's June 16, 2009, lumbar x-ray; July 10, 2009, lumbar MRI; March 30, 2010, EKG and stress test; Dr. Biundo's August 11, 2010, consultative examination; and Plaintiff's activities of daily living (R. 301-07).

On August 31, 2010, Jeff Harlow, Ph.D., completed a Psychiatric Review Technique ("PRT") of Plaintiff. Dr. Harlow found Plaintiff was positive for affective and anxiety-related disorders (R. 309). He listed Plaintiff's affective disorder as "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" (R. 312). Plaintiff's anxiety-related disorder was recurrent, severe panic attacks "manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week" (R. 314). Dr. Harlow found Plaintiff had mild restrictions of her activities of daily living; mild difficulties in

maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Plaintiff had had no episodes of decompensation (R. 319). Dr. Harlow based his findings on Plaintiff's having not been hospitalized, Mr. Levin's August 12, 2010, Mental Status Evaluation, and Plaintiff's activities of daily living (R. 321). Dr. Harlow found the following:

> Concentration/memory-related moderate deficits are present and are caused by mental impairments as noted on the MRFC. However, the evidence indicates that the claimant can perform repetitive one and two step work like activities. Full weight of evidence is attributed to the evaluating psychologist. Statements about functional capacities are externally inconsistent with clinical results of the consultative evaluation. Thus, they are partially credible (R. 321).

Dr. Harlow completed a Mental Residual Functional Capacity Assessment (MRFC") of Plaintiff on August 31, 2010. He found Plaintiff was moderately limited relative to understanding and memory; remembering locations and work-like procedures; and understanding and remembering very short and simple or detailed instructions. Dr. Harlow found Plaintiff had the following limitations relative to sustained concentration and persistence: 1) moderately limited in her abilities to carry out very short and simple instructions, carry out very detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and 2) not significantly limited in her abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and make simple work-related decisions (R.323-24). Dr. Harlow found, as to interacting socially, Plaintiff was not significantly limited in her abilities to interact appropriately with the general public, ask simple questions, request assistance, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers or peers

without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Dr. Harlow found, as to Plaintiff's adaptation, she was not significantly limited in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others (R. 324). Dr. Harlow found Plaintiff's "Panic and Borderline-Personality Disorders (sic) cause some limitations in specific functional capacities as denoted in Section I of this MRFC. Such limitations are of a moderate nature or less" and she could perform repetitive work-related activities (R. 325).

Plaintiff's August 31, 2010, psychological progress notes read Plaintiff reported being "extremely overwhelmed" with anxiety. She reported crying spells, depression, anxiety, racing thoughts, feeling hopeless and helpless, and anhedonia. Dr. Salman increased Plaintiff's dosage of Seroquel (R. 355).

Plaintiff's Disability Report for her appeal of the Initial Determination stated there had been no change (for better or worse) in her illnesses, injuries or conditions since she last completed her report in June, 2010 (R. 198). There were no changes in her abilities. She noted, in addition to her prescriptions for her mental impairments, that she continued to take Naproxen, prescribed by her treating physician, for "chronic back pain" (R. 201). She continued to state bending, standing, walking, and sitting, as some of her problems, and still stated she could walk only "50 yards" without needing to rest for "5 minutes."

On October 12, 2010, Plaintiff reported she had increased mood swings, anxiety, good sleep overall, racing thoughts "sometimes," stable appetite, good and "varie[d]" energy, and increased headaches. Plaintiff had no psychomotor retardation, suicidal/homicidal thoughts, or psychotic symptoms. Dr. Salman renewed Plaintiff's prescriptions (R. 354).

On November 1, 2010, Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lateef found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour work day; and push/pull unlimited (R. 328). Plaintiff could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl. Plaintiff could occasionally balance and never climb ladders, ropes, or scaffolds (R. 329). Plaintiff had no manipulative, visual or communicative limitations (R. 330-31). Plaintiff had no limitations relative to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid even moderate exposure to hazards (R. 331). Dr. Lateef reduced Plaintiff's RFC to medium (R. 334).

On November 5, 2010, Frank Roman, Ed.D., reviewed Plaintiff's file and affirmed Dr. Harlow's August 31, 2010, findings (R. 335).

On November 10, 2010, Plaintiff reported to Dr. Salman's P.A. that she was "not as good as last visit." She was sleeping good; had panic attacks; was impatient, irritable, and anxious; was "worrie[d] something bad [was] going to happen"; had "half" energy; had increased headaches; was afraid to go out in public; and was "still . . . fearful of everything." She reported having had "1 good week." She said she felt hopeless and helpless. Her dosage of Topamax was increased (R. 353).

Dr. Salman's P.A.'s December 7, 2010, psychological progress note read that Plaintiff was "feeling better than last month – [felt] things improved." Her sleep was good and racing thoughts were calmer. She reported an "improvement in mood." She had decreased energy and would "sit and stare at wall." She had no psychomotor retardation or suicidal or homicidal thoughts (R. 352).

Plaintiff's Disability Report for her Appeal on December 23, 2010, said there had been no change (for better or worse) in her illnesses, injuries, or conditions since her last report of September

17

10, 2010 (R. 216).

Dr. Salman's P.A.'s psychological progress note, dated January 4, 2011, read that the "holidays were rough – calmer now since their (sic) over." Plaintiff reported depression, agitation, irritability, being anxious, and not falling asleep at night. She felt "overwhelmed." Plaintiff felt hopeless and helpless, had decreased energy and anhedonia, and had crying spells. She said she "didn't want to get out of bed" and did "not feel like getting bath, make up on." Plaintiff had no suicidal or homicidal thoughts; she showed no psychomotor retardation. Plaintiff requested refills of her medications. Her dose of Seroquel was increased (R. 351).

Plaintiff's January 31, 2011, psychological progress notes, prepared by Dr. Salman's P.A., read Plaintiff reported being depressed, agitated, and irritable. She was "up and down all night" and not sleeping well. Her manic symptoms were "highs & lows" and racing thoughts. Plaintiff cried, felt helpless and hopeless, and had decreased energy. Plaintiff reported she had "found out Aunt has leukemia," and her niece had "passed away in a car accident 2 yrs. ago in February." Dr. Salman increased Plaintiff dosage of Lamictal (R. 350).

Plaintiff's March 7, 2011, psychological progress notes, prepared by P.A. Bland, read that she had increased crying spells and was depressed and anxious. Plaintiff felt hopeless and helpless. She had decreased energy and anhedonia. Plaintiff informed P.A. Bland that her forty (40) year old cousin died suddenly from a heart attack the previous week. Plaintiff stated she felt like she was "having a nervous breakdown." She had no psychotic symptoms. P.A. Bland decreased Plaintiff's dosage of Lamictal, discontinued Seroquel, and added Risperdal (R. 349).

On March 18, 2011, Dr. Salman's P.A.'s psychological progress note read Plaintiff was anxious and cried "all the time – all day long." She was sleeping good. She felt like she was "waiting for something else bad to happen" and was "consumed by these thoughts." She could not

18

talk to people "without crying." Plaintiff stated she did not experience any difference in her symptoms with medications. She felt like she was "in 'crisis mode.'" Plaintiff was not homicidal or suicidal. Plaintiff's prescription for Risperdal was continued. Plaintiff was advised to present to an emergency department if her symptoms worsened (R. 348).

A March 22, 2011, psychological progress note read that Plaintiff was having "difficulty" with depression and mood swings. Her sleep was good. She had crying spells. She stated she was very depressed; she was taking "a lot of meds." It was suggested that Plaintiff be admitted to the hospital, but she refused. Dr. Salman prescribed Abilify and noted Plaintiff was to participate in counseling with Amy Woodruff the next day (R. 347).

The psychological progress note, dated March 23, 2011, completed by Ms. Woodruff, read that Plaintiff had difficulty with depression, mood swings, agitation, anxiety, feelings of hopelessness and helplessness, and anhedonia. Ms. Woodruff found Plaintiff's affect was labile. Ms. Woodruff discussed "her last 2 exams & possible hospitalization to stabilize meds" with Plaintiff. Ms. Woodruff "processed [Plaintiff's] fear/concern of going into hospital - family obligations and fear of being taken off meds that she [felt were] helpful," specifically, Lamictal, Seroquel, Ambien, and Ativan. Plaintiff informed Ms. Woodruff that she felt "anxiety & depression [were] worsening due to family stressors and [felt] mood [would] improve after stress eases." Ms. Woodruff discussed Plaintiff's concern about her being on too many medications. Ms. Woodruff encouraged Plaintiff to speak with her family about medications and hospitalization (R. 346).

Plaintiff reported to P.A. Bland, on March 25, 2011, that she had depression, mood swings, agitation, anxiety, and crying spells. She felt hopeless and helpless. Plaintiff stated Risperdal made her "feel wiped out" and, "since the addition of Abilify[,] depression and mood has stabilized." She "[felt] current meds [were] helpful." P.A. Bland discontinued Risperdal, continued "current meds,"

and would "attempt to wean [Plaintiff] off of meds one at a time once mood stabilize[d]" (R. 345).

Plaintiff's April 20, 2011, psychological progress note read that Plaintiff was positive for depression, agitation, irritability, being anxious, and not sleeping. Plaintiff reported racing thoughts, feelings of hopelessness and helplessness, and decreased energy. She woke between 4:30 a.m. and 5:00 a.m. and, "after 3rd night," she "crash[ed]. She had no interests, was "lazy," and was "not motivated." Dr. Salman increased Plaintiff's dosages of Lamictal, Topamax, and Abilify (R. 344).

On May 9, 2011, Plaintiff presented to P.A. Bland with complaints of depression, agitation, irritability, anxiety, and sleeping difficulties. Plaintiff reported crying spells, "no tolerance," and "always feel[ing] stress." Her appetite was normal. She woke every hour and rose at 3:30 a.m. This sleep pattern had been going on for two (2) weeks. P.A. Bland noted Plaintiff's appearance was appropriate, casual, and neat. Her eye contact was good, gait was normal, coordination was good, and behavior was cooperative. She was oriented to person, place, date, time, and situation. Plaintiff had no psychomotor retardation or suicidal or homicidal thoughts. Her speech was clear, affect was labile, and short-term memory was impaired. Plaintiff stated she felt "she need[ed] to be seen today to address sleep issues." Plaintiff's dosage of Seroquel was increased (R. 343).

Plaintiff presented to P.A. Bland on May 23, 2011, with complaints of depression, agitation, irritability, anxiety, and racing thoughts. Plaintiff stated she had a "complete lack of energy" and anhedonia. Plaintiff stated she felt her mood was "overall [a] little better." She forced herself to do things. She felt "tired all the time." Her appetite was normal, and her sleep was "adequate." P.A. Bland found Plaintiff's appearance was appropriate , casual, and neat. Her gait was normal; she was oriented as to person, place, date, time, and situation; her behavior was cooperative. Plaintiff had no psychomotor retardation symptoms. She had no suicidal or homicidal thoughts. She described her mood as "depressed." Her affect was sad. Her speech was clear. Her thought content was

appropriate and her memory was normal. P.A. Bland diagnosed bipolar II disorder. P.A. Bland increased Plaintiff's dosage of Wellbutrin and continued her prescriptions for Seroquel, Topamax, Lamictal, Ativan, and Ambien. P.A. Bland encouraged Plaintiff to engage in support therapy for "reassurance/redirection" (R. 342).

On June 13, 2011, Plaintiff reported depression, mood swings, and anxiety to Dr. Salman. She stated her "energy & interests ha[d] improved slightly." Plaintiff stated her family had "noticed a difference," and she had "noticed a small difference." Her sleep was adequate, appearance was appropriate, and gait was normal. She was oriented as to person, place, date, time, and situation. She was cooperative. Dr. Salman noted Plaintiff had no psychomotor retardation or agitation and no suicidal or homicidal thoughts. Her affect was euthymic. Her speech was clear. Her memory was normal. Her thought content was appropriate. Dr. Salman diagnosed bipolar II disorder. Dr. Salman prescribed Seroquel, Lamictal, Topamax, Ambien, Ativan, and Wellbutrin (R. 341).

On July 18, 2011, P.A. Bland treated Plaintiff for depression, agitation, irritability, and racing thoughts. Plaintiff reported she had anxiety one "[week] before wedding." Plaintiff stated she "got through the wedding" and that she had "want[ed] the day to go away & night to come." Plaintiff stated she was unable to focus and concentrate; she had decreased energy and motivation. P.A. Bland noted Plaintiff's gait was normal; she made good eye contact; she was dressed casually but neatly; she was oriented as to time, place, date, person, and situation; and she was cooperative. Plaintiff showed no psychomotor retardation or agitation, and she had no homicidal or suicidal thoughts. P.A. Bland diagnosed bipolar II disorder and continued Plaintiff's prescriptions for Ambien, Ativan, Seroquel, Abilify, Lamictal, Topamax, and Wellbutrin (R. 340).

Plaintiff reported to P.A. Bland on August 11, 2011, that she had depression, mood swings, and anxiety. Her racing thoughts had decreased. Plaintiff reported she could not afford Abilify and

21

she had not medicated with it in one (1) week. Plaintiff informed P.A. Bland that she discontinued medicating with Seroquel because, after 4 days it made her feel "'drunk.'" P.A. Bland noted Plaintiff's gait was normal; she was casually and neatly dressed; she was cooperative; she was oriented as to person, place, date, time and situation; she had no psychomotor retardation; she had no suicidal or homicidal thoughts or ideations; her thought content was appropriate; and her affect was labile. Plaintiff described her mood as "down." She stated she had "difficulty remembering if bills [were] paid" and what "time of the month" it was. P.A. Bland noted Plaintiff's short-term memory was impaired. P.A. Bland noted Plaintiff continued to medicate with Lamictal, Ambien, Wellbutrin, Topamax, and Ativan. P.A. Bland increased Plaintiff's Wellbutrin dosage, renewed Plaintiff's other prescriptions, and instructed Plaintiff to engage in support therapy (R. 339).

Plaintiff presented to P.A. Bland on September 16, 2011, with complaints of depression, agitation, irritability, anxiety, and racing thoughts. Her appetite was normal; she had hypersomnia; she was cooperative; her gait was normal; she was dressed casually and neatly; she made good eye contact; and she had good coordination. She was oriented as to person, place, date, time and situation. She showed no psychomotor retardation and had no suicidal or homicidal thoughts. Plaintiff described her mood as "down." Her affect was constricted, speech was clear, thought content was appropriate, and memory was normal. P.A. Bland made no diagnosis. P.A. Bland "restart[ed] Abilify, renewed Plaintiff's medications, and recommended support therapy (R. 338).

On October 12, 2011, Plaintiff presented to Dr. Salman with complaints of no energy, agitation, anxiety, irritability, racing thoughts, and difficulty sleeping. Ambien was not helping her sleep. Her appetite was normal. She was oriented, her appearance was appropriate, and her gait was normal. Plaintiff had no psychomotor retardation or agitation or suicidal or homicidal thoughts. Her speech was clear, affect was sad, thought content was appropriate, and memory was normal. Dr.

Salman prescribed Restoril and diagnosed bipolar II disorder (R. 337).

Plaintiff was treated for depression by Dr. Salman on November 9, 2011. She stated she was "still feeling down" but "Restoril [was] helping." She did not put on make up or style her hair. Her sleep was adequate; she was able to fall back to sleep if she woke during the night. Her appearance was appropriate. She was cooperative and oriented. Her gait was normal. Her affect was labile, and her speech was clear. Dr. Salman diagnosed bipolar II disorder and prescribed Deplin. Plaintiff also medicated with Restoril, Ativan, Abilify, Lamictal, Topamax, and Wellbutrin (R. 336).

Dr. Salman completed a Psychiatric Review Technique of Plaintiff on December 9, 2011 (R. 366). As to Plaintiff's affective disorder, he found she experienced a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," which was evidenced by depressive syndrome, manic syndrome and bipolar syndrome. Plaintiff's depressive syndrome was characterized by anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Dr. Salman found Plaintiff's manic syndrome was characterized by hyperactivity, pressures of speech, flight of ideas, inflated self esteem, decreased need for sleep, and easy distractibility. Plaintiff's bipolar syndrome included a "history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" (R. 369). Dr. Salman found anxiety was the predominent disturbance of Plaintiff's anxiety-related disorder, which was generalized and persistent and included motor tension, autonomic hyperactivity, apprehensive expectation, vigilance, and scanning. Plaintiff's anxiety-related disorder also created symptoms of "persistent irrational fear of a specific object, activity or situation which result[ed] in a compelling desire to avoid the dreaded object, activity, or situation"; "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom

occurring on the average of at least once a week"; and "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (R. 371). Dr. Salman found Plaintiff had moderate limitations as to her activities of daily living and her ability to maintain concentration, persistence, or pace. Dr. Salman found Plaintiff had extreme limitations as to her ability to maintain social functioning. Dr. Salman found Plaintiff had experienced four (4) or more episodes of decompensation, each of extended duration (R. 376). Dr. Salman found there was insufficient evidence to establish the presence of the "C" criteria of the listings (R. 377).

Dr. Salman signed a Medical Source Statement (Mental) of Plaintiff on December 12, 2011. Dr. Salman found Plaintiff's limitations in all areas of "Understanding and Memory" were moderately severe. In the category of "Sustained Concentration and Persistence," Dr. Salman found 1) Plaintiff was moderately limited in her abilities to carry out very short and simple instructions and sustain ordinary routine without special supervision and 2) her capacity to carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychological based symptoms, and perform at a consistent pace without any unreasonable number and length of rest periods was severely limited (R. 379). In the category of "Social Interaction," Dr. Salman found the following limitations: 1) Plaintiff's abilities to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness were mildly limited; 2) Plaintiff's abilities to accept instructions and respond appropriately to criticism from supervisors were moderately limited; 3) Plaintiff's abilities to ask simple questions, request assistance, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes were moderately severely limited; and

4) Plaintiff's ability to interact appropriately with the general public was severely limited. Dr. Salman found Plaintiff was limited, as follows, relative to her "Adaptation": 1) Plaintiff was mildly limited in her ability to be aware of normal hazards and take appropriate precautions; 2) moderately limited in her ability to respond appropriately to changes in the work setting; 3) moderately severely limited in her ability to set realistic goals or make plans independently of others; and 4) severely limited in her ability to travel in unfamiliar places or use public transportation (R. 380).

In support of the above findings, Dr. Salman noted Plaintiff had been diagnosed with bipolar II disorder and panic disorder. As for Plaintiff's medical history, Dr. Salman wrote the following: "Manic symptoms, anxiety, depression, panic attacks, mood swings, crying spells, anhedonia, racing thoughts, irritability." For "Clinical Observations/Testing," Dr. Salman wrote the following: "Patient is neatly groomed with flat affect, tearful at times during interview. Patient presents with appropriate thought content, delayed reactions at times. Patient is cooperative, alert & oriented to time, place, situation" (R. 380). Dr. Salman found Plaintiff's impairment would be expected to last or had lasted for twelve (12) months. He found Plaintiff's psychological conditions would not be expected to exacerbate pain from a physical condition. Dr. Salman noted Plaintiff's insured status expired in July, 2011, and found her impairment could be "related back to that date or before." To support this finding, Dr. Salman noted Plaintiff's initial examination with him was in April, 2010, and she had "indicated at [that] appointment that she had long history of bipolar disorder." Dr. Salman found Plaintiff had no other capabilities that were affected by her impairment (R. 381). Dr. Salman opined Plaintiff would have "'good days'" and "'bad days,'" and she would be absent from work more than four (4) times per month. Dr. Salman listed no medical or clinical findings to support the opinions he expressed in the questionnaire (R. 382).

<u>Administrative Hearing</u>

At the administrative hearing, Plaintiff testified she "almost never" drove; she had a valid driver's license (R. 32). Plaintiff's mother had driven her to the hearing. She had graduated high school and had two (2) years of college (R. 33). Her current income was $800.00 per month from a long-term disability provider. She lived with her parents (R. 34). She had not made any attempts to gain employment because she was "under medical care" and "not able" to do so (R. 36-37).

Plaintiff stated she was unable to work due to "bipolar and panic disorders." "Bipolar mood swings" and "panic" were the conditions that "most interfere[d] with her work" (R. 35, 37). When asked by the ALJ if there were any other physical or mental conditions that affected her ability to work, Plaintiff responded, "No" (R. 37). Plaintiff testified she had been unable to work since May 7, 2010, because that was the day she "had a nervous breakdown in the office" and was taken to an emergency department (R. 35). Plaintiff stated she did not know what led to her having a nervous breakdown (R. 36). Plaintiff testified the panic disorder affected her ability to work because she was "highly likely to have an attack and just leave at any given moment through the day, with no trigger or notice." Plaintiff testified the bipolar disorder affected her ability to work in that there were "days that [she had] really high manic stages where [she was] just doing great, and even creating additional projects, and, and reports and stuff to do for the government. And then when the down time [came], [she could not] even get out of [her] bedroom to get to work" (R. 37).

The ALJ asked if there was any other testimony Plaintiff wanted to provide about how her physical or mental conditions interfered with her work. Plaintiff responded that, due to her mental condition, "you can't trust yourself to be available or responsible to yourself or the job" (R. 38).

Plaintiff testified she medicated with Lamictal, Wellbutrin, Topamax, Ativan, and "other[]" drugs that she could not remember (R. 38). Plaintiff reported no side effects to any of the

26

medications. Plaintiff could dress, shower, talked daily to her adult children on her cellular phone and her parents' house phone, and saw her children once a week when they visited her (R. 39). Plaintiff's mother did most of the cooking; she cooked "probably not even once a week." Plaintiff first testified she "never" shopped unless she was forced to do so; she then testified she had shopped two (2) weeks prior to the administrative hearing for two (2) hours at a mall with her daughter at Christmastime. Plaintiff washed dishes by hand a "[c]ouple times a week" and washed one (1) load of laundry per week. She made her bed twice per week and vacuumed once per week. Plaintiff worked "some" in her flower garden. She took hay to the horses at her parents' farm and fed them "a couple of times a week"; her father fed the horses the rest of the time. When asked what Plaintiff had done the previous weekend, she replied "Nothing." Plaintiff then stated she "just kind of wandered around the house" (R. 41). Plaintiff attended her daughter's wedding in June (R. 42).

The ALJ asked Plaintiff what her "family stressors" were. She answered her niece had been killed in a car accident three (3) years earlier and her aunt had been diagnosed with leukemia (R. 47-48). Plaintiff stated her symptoms would "come[] and go[]. One month . . . [she was] doing pretty darn good, and then the next [doctor's] visit it's been the worse month since, since the onset of this last major episode." Plaintiff could not "tell any difference" in her mood when she medicated with Abilify. When that medication was discontinued, however, she "crashed," and her doctor prescribed it for her again because he "decided that maybe it was doing more for [her] than what we had originally thought . . . ." She testified that her medication was helpful to her because she was "here" and "somewhat" stabilized. Plaintiff testified she had no energy or ambitions (R. 48).

Plaintiff was then questioned by her counsel. When asked if she could live alone, Plaintiff stated, "I don't know." She testified that she lived with her parents "for financial reasons" and because if she lived alone, she would "mostly . . . just stay in the house and not leave the bedroom,

or eat, or . . . wouldn't do anything." Plaintiff stated her adult children and parents encouraged her to "get up, get dressed, and get out of the house . . . [a]ll the time" (R. 42). Plaintiff testified that she "could care less" if she completed her personal hygiene every day. She stayed in her pajamas "most days" if she did not leave the house. Plaintiff testified that "since this last breakdown, [she did not] believe [she had] ever actually showered, curled [her] hair, and put on makeup in one day." Plaintiff stated she washed her hair and showered the night before a doctor's appointment because she was "not capable" of getting ready for the appointment on the day of the appointment. Plaintiff testified that the shopping excursion with her daughter did not go well because "all [she] wanted to do was get out" of the mall. Plaintiff stated her daughter's wedding was "awful" because she "kept trying . . . to not think about [her] feelings . . . and not let [her] mental state interfere with that, but it was a struggle" (R. 43). Plaintiff stated she could not stay "at the reception long." Plaintiff testified she could not plan one day to do chores the next day. She would rise and "just sit and stare at the wall." Plaintiff's ability to function varied. She stated when she was "manic" she could paint a wall or remove wallpaper, and, then the next day, wake and ask herself, "How am I going to finish this?" (R. 44). It would take her weeks to finish the project. Plaintiff testified that, in May, 2010, she was in a "really high state" and did gardening for her mother and daughter, spring cleaned, and painted both houses. Plaintiff stated her parents did not depend on her to feed the farm animals because she "would look outside, think [she was] going to do that after a while, and not do it" (R. 45). Plaintiff testified that her condition, relative to her working, had been "an ongoing problem for . . . 20 years." She did not always want to get out of bed in the morning. There were occasions she would have panic attacks when leaving the house for work. Plaintiff stated she had panic attacks "pretty often . . . three or four a week." She took medication for panic attacks, breathed deeply, and told herself to relax. Plaintiff testified she experienced fewer panic attacks now that she was "medicated and at

28

home" (R. 46). When Plaintiff worked, she would leave work when she had a panic attack (R. 47).

The ALJ asked the VE the following hypothetical questions:

. . . [A]ssume a hypothetical individual of the same age, education, and work experience as the Claimant who retains the capacity to perform light work, and a sit/stand option allowing the person to briefly, for one to two minutes, alternate sitting or standing positions at 30-minute intervals without going off-task; who is limited to occasional postural except no climbing of ladders, ropes, or scaffolds. Must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving.

This work is limited to simple, routine, and repetitive tasks requiring only simple decisions; free of fast-paced production requirements with few workplace changes; who's to have no interaction with the public, and only occasional interaction with coworkers. Can such an individual perform the past work of the Claimant as it was actually performed or as it is customarily performed per the DOT? (R. 51-52).

The VE responded in the negative, but he testified that, in the national and local economies,

there were other occupations such a hypothetical person could perform. Specifically, the VE testified

that the jobs of garment folder, house cleaner, and hand washer were available (R. 52-53).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ LaVicka made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since May 7, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; depression; bipolar disorder; anxiety; and panic disorder (20 CFR 404.1520© and 416.920©) (R. 14).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1529(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 15).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the type of work must: provide a sit/stand option, allowing the person to change between sitting and standing for one to two minutes at thirty-minute intervals without breaking task; entail no climbing of ladders/ropes/scaffolds and no more than occasional other postural movements (i.e. climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling); entail no exposure to hazards (i.e. unprotected heights or dangerous machinery); be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production and involving simple work-related decisions with few, if any, work place changes; and entail no more than occasional interaction [with] coworkers and no interaction with the public (R. 16).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 15, 1961[,] and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 20).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 7, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 21).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.    The ALJ committed an error of law because he applied a credibility standard that required Plaintiff to provide untruthful testimony in order to be found credible.

2.    The ALJ committed an error of law because he erroneously rejected the opinions of the treating psychiatrist.

3.    The ALJ committed an error of law because he incorrectly adopted the state agency physicians' opinions over the opinions of the treating psychiatrist.

The Commissioner contends:

1.    Substantial evidence supports the ALJ's finding that Plaintiff's allegations of disabling pain and limitations were not entirely credible.

2. The ALJ reasonably evaluated the medical opinion evidence of record.
    A. The ALJ reasonably evaluated Dr. Salman's medical opinion.
    B. The ALJ reasonably evaluated Dr. Harlow's medical opinion.

## C. Credibility

Plaintiff first argues: "The ALJ committed an error of law because he applied a credibility standard that required Plaintiff to provide untruthful testimony in order to be found credible." Defendant contends substantial evidence supports the ALJ's finding that Plaintiff's allegations of disabling pain and limitations were not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of

the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. He therefore found she met the threshold step of Craig. He was then required to evaluate the intensity and persistence of her symptoms and the extent to which they affect her ability to work. This evaluation must take into account "all the available evidence," including her medical history, medical signs, and laboratory findings, any objective medical evidence of pain and other symptoms, and any other evidence relevant to the severity of the impairments, such as evidence of her daily activities, specific descriptions of the symptoms, and any medical treatment taken to alleviate the symptoms.

The ALJ in this case separated Plaintiff's claimed physical impairments from her mental ones. He specifically wrote:

> In terms of the claimant's alleged physical complaints, the fact that the claimant denied any physical complaints at the hearing greatly undermines her credibility, as she previously alleged that she had difficulty walking even five minutes because of her degenerative disc disease and vertigo. However, despite the claimant's admission, in order to give the claimant the utmost benefit of the doubt, the undersigned has considered the medical evidence of record in terms of the claimant's physical impairments.

(Emphasis added). A review of the Decision shows the ALJ reviewed the factors from Craig regarding Plaintiff's alleged physical impairments.

Plaintiff complains that, because she denied having any physical impairments during the hearing, the ALJ "placed her in an impossible predicament. On one hand, if [she] did not continue to assert physical complaints, the ALJ would find her not credible. On the other hand, if she did

allege physical complaints the ALJ would surely find her not credible because the objective evidence did not support her complaints of physical symptoms. [She] was in a no win situation right from the start." The undersigned does not agree.

The first record in this case is a June 2009, office visit as a new patient to Dr. Woofter, who became Plaintiff's treating physician. The reason for the visit was sharp low back pain that radiated to both legs. Dr. Woofter ordered x-rays, which were normal. Two weeks later, Plaintiff again complained to Dr. Woofter of chronic back pain which radiated to both legs. He diagnosed chronic back pain and ordered an MRI. Plaintiff presented to the ER the next month for lumbar pain. The MRI showed L4-L5 disc change without definite nerve root impingement. Plaintiff continued to report pain across her lower back. Dr. Woofter referred her to surgery. He diagnosed lumbar degenerative disc herniation and prescribed Lortab and Naproxen.

Plaintiff filed her application for Disability Benefits on May 17, 2010, with an alleged onset date of May 7, 2010 (R. 137). Where asked to list all the physical or mental conditions that limited her ability to work, Plaintiff listed bipolar disorder, panic disorder, depression, paranoid, vertigo, and disc disease . Under "Medical Treatment" she included treatment starting in 1995 through the application date (2010), by her family doctor for back pain, vertigo, and depression. She stated that "Degenerative disc disease and vertigo affect[ed] bending, standing, walking, sitting and general movement." She expressly wrote that she could walk only 50 yards before needing to stop and rest for five minutes. On her Personal Pain Questionnaire, Plaintiff stated she had aching, burning, "shooting pain" in her lower back that was "continuous[] during flare-up." Nothing made it better, and "everything" made it worse. She could not "stand, sit, stretch without this constant shooting pain." She had been taking Loracet the summer before, but stopped because it was addictive. She

was at the time of the application taking Naproxen every four hours which "sometimes" relieved the pain.

Based on these allegations in her application, Plaintiff was referred by the State agency for a consultative physical examination in August 2010. She reported her chief complaints as "difficulties in terms of being able to function due to mental illness <u>as well as low back pain</u>." (Emphasis added). She also reported chronic vertigo. Dr. Biundo performed the examination, finding Plaintiff had lumbosacral spine features most consistent with degenerative changes and recommended physical therapy. Physical RFC's were completed based on Plaintiff's alleged back impairment and vertigo. Her RFC was reduced to medium.

Plaintiff was also referred for a consultative evaluation by psychologist Levin in August 2010. Under "Chief Complaints" is written: "The claimant states that she is suffering from physical problems that include vertigo and a disc disease . . . ." Mr. Levin even diagnosed Plaintiff under Axis III with "Vertigo, disc disease, high cholesterol, all as reported by the claimant."

Plaintiff's Disability Report for her Appeal (September 2010) stated there had been no change (for better or worse) in her illnesses, injuries or conditions since she last completed her report in June, 2010 (R. 198). There were no changes in her abilities. She noted, in addition to her prescriptions for her mental impairments, that she continued to take Naproxen, prescribed by her treating physician, for "chronic back pain" (R. 201). She continued to state bending, standing, walking, and sitting, as some of her problems, and still stated she could walk only "50 yards" without needing to rest for "5 minutes."

On November 1, 2010, a State Agency reviewing physician completed a physical RFC of Plaintiff. There was clearly no indication at that time that Plaintiff was no longer alleging any

physical impairments.

Plaintiff's Disability Report in support of her request for hearing on 12/23/2010, stated there had been no change (for better or worse) in her illnesses, injuries, or conditions since her last report of September 10, 2010 (R. 216).

The undersigned cannot find the ALJ erred by considering Plaintiff's alleged physical impairments, despite her denial of them at the hearing. Her application, only about a year-and-a-half prior to the Administrative Hearing, listed bipolar disorder, panic disorder, depression, paranoid, vertigo, and disc disease as her impairments that affected her ability to work. Under "Medical Treatment" she included treatment starting in 1995 through the application date, by her family doctor for back pain, vertigo, and depression. She stated her back pain and vertigo caused limitations in bending, walking, sitting, standing. She expressly stated she could walk only 50 yards before needing to rest for five minutes. She never changed that list of impairments or limitations. Had the ALJ not noted any physical impairments, the undersigned could easily foresee a claim that the ALJ did not take into account all Plaintiff's alleged impairments.

Plaintiff is correct that the ALJ made a factual error in stating that Plaintiff claimed she had difficulty walking even five minutes. Instead, Plaintiff actually alleged she could walk only 50 yards before needing to rest five minutes. This error is not reversible, however. Plaintiff clearly stated in writing that she could walk only 150 feet before needing to rest for five minutes due to physical impairments (whether back pain, vertigo or COPD). One does not need to be a doctor or vocational expert to determine this limitation would be at least as disabling as "difficulty walking even five minutes." Significantly, Plaintiff never changed this limitation in later documents submitted to the Agency, despite the question being expressly asked whether any of her impairments had changed for

better or worse.

The undersigned does not find "[t]he ALJ committed an error of law because he applied a credibility standard that required Plaintiff to provide untruthful testimony in order to be found credible." He found her complaints of physical pain and limitations, which she never changed in any documents submitted to the agency, were not credible. Substantial evidence supports the ALJ's determination regarding Plaintiff's physical impairments, and his determination that Plaintiff was not credible regarding those complaints.

The ALJ found Plaintiff had the severe mental impairments of depression, bipolar disorder, anxiety, and panic disorder (R. 14). Again, he was therefore required to consider all the available evidence to determine whether her alleged functional limitations were credible. The ALJ discussed Plaintiff's presentation to the ER for "bad depression" and anxiety in May 2010, noting that she was not admitted, but was discharged five hours later in good condition. He then discussed her treatment with Dr. Salman, noting that, although her condition and moods were up and down, she was often described as "better." He expressly noted the March 2011, suggestion by Dr. Salman that Plaintiff undergo inpatient hospitalization to stabilize her mood, but, as he also noted, she never followed this advice and, in fact, "refused." One of the reasons she gave her therapist for her refusal to go to the hospital was "family obligations." Only months later, Plaintiff was able to get through her daughter's wedding. In November 2011, she was still "down," but Restoril was "helping."

The ALJ then discussed Plaintiff's consultative examination with psychologist Levin. The psychologist diagnosed bipolar disorder and panic disorder. He found, however, that her immediate and remote memory was normal, and her recent memory only moderately deficient. Her persistence and pace were normal and her concentration was only moderately deficient. Her social functioning

37

was described as pleasant and appropriate throughout the interview. She was fully oriented, and her thought content and processes and judgment were all within normal limits.

The ALJ also discussed Plaintiff's daily activities. She reported to Mr. Levin that her daily activities included housework, gardening, taking care of farm animals, reading, and having meals with her family. Plaintiff argues that the ALJ ignored "voluminous" evidence contrary to his credibility finding. Plaintiff expressly refers to her July 2010, Function Report, in which she stated she had become paranoid and fearful of work, social settings, and public places and did not want to leave home; tried to straighten up house "when I can stay focused;" indicated she was not caring for animals; did household chores and laundry "only when forced due to necessity;" and it took her two days to accomplish simple tasks "due to lack of energy, concentration and interest." She needed encouragement and reminders to perform even simple tasks. She was unable to read anymore due to lack of concentration and interest. This same Function Report also states, however, that Plaintiff had "no problem" with her personal care and needed no reminders to care for her personal needs and grooming or to take her medications. She reported she prepared "very simple" meals "once a day." The undersigned notes this is the same report in which Plaintiff states she can only walk 150 feet before needing to rest five minutes.

Only about a month later, however, and at about the same time as Mr. Levin's examination, Plaintiff was examined by Dr. Biundo. At that time she reported she was "functionally independent in all areas" except for not being able to drive due to fear because of her niece's fatal accident.

During the hearing, the ALJ asked Plaintiff how often she went shopping, to which she replied: "Never." He then asked her when the last time she went shopping was, and she replied: "Well, I had to go for Christmas, but it's because my daughter made me." In fact, she had gone to

38

the mall that past weekend, staying for about two hours, during the holiday shopping season. She washed dishes a couple of times a week, did laundry once a week, made the beds twice a week, and vacuumed once a week. She testified she helped take care of the farm animals at her parents' farm. When asked how much, she said, "Not like I was, but, you know, you don't want to see them starve." The ALJ then asked her what she did for the animals, and she said she took hay out to the horses. The ALJ asked how often she took hay to the horses, to which she replied: "Well, it's just now time to start doing it again. So lately I've done it a couple of times a week. My dad does it the rest of the time." She testified she had gone to her daughter's wedding and reception that past June.

When her own attorney asked what prevented her from living alone, Plaintiff first said, "Well, I'm not working, so financially." She added, "But mostly I, I would just stay in the house and not leave the bedroom or eat, or I wouldn't do anything." Regarding her attendance at her daughter's wedding and reception, she stated it was "awful," but she kept trying to not think about her feelings, because it was her daughter's wedding, and not to let her mental state interfere with that, but it was a struggle. She said she could not stay at the reception long. Regarding the trip to the Meadowbrook Mall for Christmas Shopping on a weekend day shortly before Christmas, she said they were only there a couple of hours and she "couldn't wait to get out."

On March 23, 2011, therapist Ms. Woodruff discussed "her last 2 exams & possible hospitalization to stabilize meds" with Plaintiff. Ms. Woodruff "processed [Plaintiff's] fear/concern of going into hospital - <u>family obligations</u> and fear of being taken off <u>meds that she [felt were]</u> <u>helpful</u>." (Emphasis added).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F. Supp. 776

(E.D. Va.1976)).  Plaintiff appeared at the Administrative Hearing in person, with the ALJ, the VE,

and the court reporter all present.  Plaintiff was questioned by her own counsel as well as by the ALJ.

The ALJ was able to observe Plaintiff's demeanor.  There is no indication in the transcript or briefs

that Plaintiff had any trouble during this 40-minute hearing.  Further, the ALJ did find that Plaintiff

had severe mental impairments.  He found that the severity of Plaintiff's symptoms "waxed and

waned," and that she "certainly has functional limitations as a result of her bipolar disorder and

anxiety."  He placed strict limitations in her RFC based on these symptoms.

The undersigned finds, based on all the above, that substantial evidence supports the ALJ's

determination that Plaintiff's statements concerning the intensity, persistence and limiting effects

of her symptoms were not credible.

### D.  Treating Psychiatrist Opinion

Plaintiff next argues the ALJ committed an error of law because he erroneously rejected the

opinions of the treating psychiatrist, Dr. Salman.  Defendant contends the ALJ reasonably evaluated

Dr. Salman's opinion.  20 C.F.R. § 404.1527 states:

> (c) *How we weigh medical opinions*.  Regardless of its source, we
> will evaluate every medical opinion we receive.  Unless we give a
> treating  source's opinion controlling weight under paragraph (c)(2)
> of this section, we consider all of the following factors in deciding the
> weight we give to any medical opinion
>
>> (1) *Examining relationship*.  Generally we give more
>> weight to the  opinion of a source who has examined
>> you than to the opinion of a source who has not
>> examined you.
>>
>> (2) *Treatment relationship*.  Generally, we give more
>> weight to opinions from your treating sources, since
>> these  sources  are  likely  to  be  the  medical

professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The

better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

It is undisputable that Dr. Salman is a treating physician. He is also a specialist–a psychiatrist, who had treated Plaintiff about twice a month for at least a year and a half. These factors all weigh heavily in favor of according greater weight to his opinion.

The ALJ accorded little weight to Dr. Salman's PRT and MRFC. He did note Dr. Salman's extensive personal knowledge of Plaintiff's condition, stating that he "would ordinarily be considered to have a superior understanding of her clinical picture" (R. 19). He based his determination on factors 3 and 4–supportability and consistency. He first found that the limitations the psychiatrist assessed were "so extreme as to appear implausible." Id. He particularly noted Dr. Salman's opinion that Plaintiff had "extreme difficulty in social functioning," and found that

inconsistent with the record. The ALJ noted that Plaintiff was able to interact appropriately with consultative examiners. She was cooperative in weekly sessions with treating physicians and other providers. "Thus the claimant clearly has some abilities in social functioning." The ALJ also found Dr. Salman's opinions in this area "inherently inconsistent." Finally, he found Dr. Salman's opinion that Plaintiff had moderately severe difficulty understanding, remembering, and carrying out even very short and simple instructions "at odds with the findings from the consultative examination [and] at odds with the claimant's activities of daily living, which include caring for farm animals." He concluded: "Overall, Dr. Salman has greatly overstated the claimant's functional limitations."

In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

In 2009, Plaintiff told her treating physician she was doing well on Lexapro and Xanax, and there were days she had increased anxiety and needed Xanax. In February 2010, she reported having gone to the ER and was told she had an anxiety attack, and that her last panic attack was one month earlier. Her next reported panic attack was three months later, in May, 2010. At that time she told her doctor she needed time off from work because of "recurrent panic attacks." In July she was evaluated by Dr. Salman's physician assistant for depression, anxiety, and agitation which occurred

"at times." Later, she saw a social worker in the office, who discussed with her her emotions "after having a benefit for her deceased niece." In August, Plaintiff presented to Dr. Biundo, whom she presumably had never met, for a consultative examination. He did not mention any problems communicating with her or with her being overly anxious or panicky. She also had an evaluation with psychologist Levin, whom she also presumably had never met. He noted she was pleasant and cooperative. Her speech was normal and adequate and her social functioning was appropriate and pleasant, albeit that she appeared very anxious and depressed. She did, as already noted, go Christmas shopping at a mall with her daughter, and attended her daughter's wedding and reception. The ALJ also noted Plaintiff was cooperative with Dr. Salman. Plaintiff argues that the ALJ's reference to her cooperation put her in a "no-win situation," because if she had not cooperated, he would have found her not credible. The undersigned understands the ALJ's statement, however. Not only did Plaintiff, with alleged "extreme" difficulties in social functioning, present to Dr. Salman every other week, but she also saw P.A. Bland and therapist Woodford in between those appointments. Despite alleged disabling panic attacks, the record does not reflect any "no-shows" or cancellations of appointments, including for consultative examinations with complete strangers.

The ALJ also discussed Dr. Salman's opinion that Plaintiff had moderately severe difficulties understanding, remembering, and carrying out even very short and simple instructions. The ALJ found this opinion was inconsistent with Plaintiff's activities of daily living. These included caring for farm animals. She also stated in her Adult Function Report that she could handle a checking account and bills. Even if, as she testified, she only fed the horses a few times a week, the undersigned finds substantial evidence supports the ALJ's determination that these type of activities are not consistent with moderately severe difficulties in understanding, remembering, and

carrying out very short and simple instructions.

Dr. Salman's opinion on the PRT and MRFC are also not supported by his own records. The undersigned notes, for instance, that the record shows Dr. Salman diagnosed Plaintiff only with bipolar disorder from April 2010, through November, 2011 (R. 341, 340, 337, 336, 365), with the exception of one visit in June, 2010, when he diagnosed her instead with depression and anxiety (R. 362). His PRT, however, indicates she meets the Listings for bipolar disorder and panic disorder, with symptoms including "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." He also found she had four or more episodes of decompensation, each of extended duration. These findings are not supported by the record or his own office visits.

Based upon the above, the undersigned finds substantial evidence supports the ALJ's determination that Dr. Salman's opinion as to Plaintiff's extreme functional limitations is entitled to little weight.

### E. State Agency Physician Opinions

Plaintiff lastly argues that the ALJ erred because he incorrectly adopted the State Agency Physicians' opinions over the opinion of the treating psychiatrist. The undersigned has already found that substantial evidence supports the ALJ's according little weight to Dr. Salman's opinion. The ALJ did accord substantial weight to the opinion of State Agency psychologist Harlow, however. The ALJ noted that Dr. Harlow did not examine Plaintiff, but had access to and cited the "detailed consultative examination report prepared by examining psychologist Levin." The ALJ had earlier in his Decision cited with approval Mr. Levin's examination. Mr. Levin had diagnosed Plaintiff with bipolar disorder, severe without psychotic features, and panic disorder without agoraphobia.

He noted, however, that Plaintiff's immediate and remote memories were within normal limits and her recent memory was only moderately deficient. Her persistence and pace were within normal limits and her concentration was only moderately deficient. Her social functioning was described as pleasant and appropriate, she was fully oriented, and her thought content, thought processes, and judgment were all within normal limits.

20 CFR § 404.1527(f)(2)(I) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

S.S.R. 96-6p similarly reads, in part, as follows:

Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

Further:

In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Id.

Plaintiff argues that her case does not represent an "appropriate circumstance" where a State agency reviewing psychologist's opinion may be entitled to greater weight than her treating psychiatrist's opinion. In particular, Plaintiff notes that Dr. Harlow did not base his opinion on a complete case record. First, he could not have done so, as his opinion was rendered in August 2010, whereas evidence was subsequently submitted covering records well into 2011. She further notes that Dr. Harlow based his opinion on the report of the one-time examination performed by Mr. Levin, despite there being other evidence from treating physicians in the record.

The ALJ was required to consider the State agency psychologists' and physicians' opinions. Further, 96-6p does not limit the "appropriate circumstances" to cases in which the State agency psychologist has reviewed a complete record, but, instead, uses this circumstance as an "example." In this case, the undersigned finds substantial evidence supports the ALJ's according greater weight to Dr. Harlow's opinion than to Dr. Salman's.

Plaintiff cites two cases from this district, <u>Lower v. Commissioner of Social Security</u> (2:04cv57), and <u>Ogden v. Astrue</u>, 597 F. Supp. 2d 626 (N.D.W. Va. 2009)(2:08cv4). In both cases (one adopting the undersigned's Recommendation and the other rejecting a different Magistrate Judge's Recommendation), United States District Judge Robert Maxwell found that the ALJ erred in relying on State agency reviewing physicians' opinions where much evidence was generated subsequent to their evaluations. The cases cited are distinguishable from Plaintiff's case, however.

In <u>Ogden</u>, the two State reviewing physicians' opinions were submitted in May and August of 2004, whereas the treating physician's opinion was submitted in November 2005. One of the reviewing physicians based his RFC on only osteoarthritis of the knees and obesity, while Plaintiff was also diagnosed with diabetes, high blood pressure, fluid retention, and COPD. Neither reviewing physician referred to any treating or examining source, only a prior ALJ decision. Further,

Judge Maxwell found that the ALJ incorrectly interpreted the treating physician's opinion.

Similarly, in Lower, the Court found that the ALJ erred in relying on the opinions of two State agency reviewing physicians. Significantly, one opinion was expressed nearly seven years before the ALJ's decision. The other was expressed about one and a half years prior to the decision, similar to the present case. Importantly, however, in Lower, the case had been remanded by the Appeals Council for the ALJ to obtain a consultative psychological evaluation. Pursuant to that order, the plaintiff was examined by psychologist Morgan Morgan, who opined he would have a number of "marked" limitations. The ALJ rejected the report, stating that the "sole basis for these assessments was the claimant's subjective statements or his behavior during the evaluation." The Court found the report was actually based on psychological testing, a mental status evaluation, a clinical interview, and review of Plaintiff's medical records, and that the ALJ's finding was therefore wrong. The Court expressly stated: "Even if the ALJ's reasoning was correct, it was the Commissioner who ordered this evaluation, arranged for it and chose Mr. Morgan to conduct it. It seems disingenuous to later complain about how the evaluation was conducted after the results return favorable for the claimant." Having found the ALJ erred by rejecting this opinion, the Court later noted that neither State agency physician could possibly have even seen it. Finally, one of the State agency psychologists had expressly found that the claimant often had deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner. The ALJ accorded that opinion "great weight" but found the claimant could work, despite the VE's testimony that that limitation would preclude any competitive employment.

The undersigned does not find any errors by the ALJ similar to those in Lower and Ogden in the present case. The undersigned has already found that substantial evidence supports the ALJ's according little weight to Dr. Salman's opinion. Although much evidence was generated subsequent

to Dr. Harlow's opinion, that evidence was much the same as was already before Mr. Levin. In fact, as argued by the Commissioner, she reported improvement. For example, Plaintiff described her symptoms to Mr. Levin as manic and depressive episodes that lasted two months each, currently in a depressed episode and sad and irritable most of the time; decreased memory, concentration, energy and interests; difficulty falling asleep and staying asleep; waking early in the morning; increased appetite and weight; crying spells four times per day; and "full panic attacks" which included hyperventilation, tachycardia, chest pain, and feeling as if she was going to have a heart attack. She medicated with Wellbutrin, Lamictal, Seroquel, Topamax, Ambien, Ativan, and Zocor. She reported wanting to stay at home and not wanting to be around anyone else, except during "manic episodes," when she was "just the opposite." She told him she cared for her own personal grooming, but may go two or three days without doing so and that she no longer bothered to do her hair or makeup. At her last visit to Dr. Salman prior to his completing his PRT and MRFC, she was taking the same medications, with the additions of Restoril and Abilify, both of which she said were helping. Plaintiff reported she did not put on makeup or style her hair. She was "feeling down." Her sleep was adequate and she was able to fall back asleep if she woke during the night. Mr. Levin diagnosed bipolar disorder, most recent episode depressed, severe without psychotic features, and panic disorder without agoraphobia. The record shows Dr. Salman diagnosed Plaintiff only with "bipolar disorder II" from April 2010, through November, 2011 (R. 341, 340, 337, 336, 365), with the exception of one visit in June, 2010, when he diagnosed her instead with depression and anxiety (R. 362). The undersigned understands that the ALJ accorded the great weight to Dr. Harlow and not to Mr. Levin, but he expressly stated this was based in large part on Dr. Harlow's review of Mr. Levin's examination and evaluation.

49

Plaintiff correctly notes that Dr. Harlow in one part of his PRT identified her mental impairments as Panic and Borderline-Personality Disorder, whereas she was actually diagnosed with Panic and Bipolar Disorder. The undersigned finds this is just a scrivener's error. Dr. Harlow based his opinion on Bipolar Disorder and a Panic Disorder (R. 312 and 313). He did not base it on a Personality Disorder (R. 316). In his narrative notes in his PRT, he expressly and correctly states Plaintiff's allegations as Bipolar, Panic, Depression, and Paranoid [sic], and her diagnoses at the consultative evaluation as Bipolar Disorder, Depressed, without Psychotic Features and Panic Disorder without Agoraphobia (R. 321). He also clearly and expressly in writing based his MRFC on Bipolar Disorder and Panic Disorder (R. 323). It is only on the final page of the MRFC that it states her disorders as Panic and Borderline-Personality Disorders (R. 325). The functional limitations Dr. Harlow found Plaintiff had were based on his review of the record, in particular Mr. Levin's examination. They were expressed in Section I, in which her diagnoses were correctly typed. The mistake in the final paragraph does not change the limitations he found or their severity, or the fact that he found she could perform repetitive work-related activities.

Upon consideration of all which, the undersigned finds substantial evidence supports the ALJ's according greater weight to the State agency psychologist's opinion than to that of Dr. Salman.

## V. CONCLUSION

In conclusion, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled from the date of her application, May 7, 2010, through the date of his decision, January 13, 2012.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's

decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 11] be **GRANTED** and the Plaintiff's Motion for Summary Judgment [D.E. 9] be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _19_ day of November, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE